## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**GABRIEL CRUZ ROJAS**, *et al.*,

    Plaintiffs,

    v.

**GMD AIRLINES SERVICES, INC.**, *et al.*,

    Defendants.

Civil No. 13-1578 (BJM)

## OPINION AND ORDER

Gabriel Cruz Rojas, Janisse Merced Rosa, and their conjugal partnership (collectively "Cruz") bring this suit against GMD Airlines Services, Inc., Raúl Colón, Victor Betancourt, Karen Pizarro, and each of their respective conjugal partnerships (collectively "GMD"), alleging religious discrimination, hostile work environment, retaliation, and constructive discharge in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.* (2012). Compl. ¶ 1.1, Docket No. 1. Cruz also claims violations of various Puerto Rico laws.[1] The parties consented to magistrate judge jurisdiction. Docket No. 22. GMD moved for summary judgment, Docket Nos. 39, 55, and Cruz opposed, Docket Nos. 43, 69.

For the reasons set forth below, GMD's motion is **GRANTED IN PART AND DENIED IN PART**.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] Puerto Rico Law 100, P.R. LAWS ANN. tit. 29, § 146 (2009 & Supp. 2013) (discrimination); Puerto Rico Law 17, P.R. LAWS ANN. tit. 29, § 171 *et seq.* (2009) (unlawful withholding of payment); Puerto Rico Law 80, P.R. LAWS ANN. tit. 29, § 185a (2009 & Supp. 2013) (unjust dismissal); Puerto Rico Law 115, P.R. LAWS ANN. tit. 29, § 194(a) (2009) (discriminatory retaliation); P.R. Civ. Code art. 1802, P.R. LAWS ANN. tit. 31, § 5141 (1990 & Supp. 2013) (tort claim).

Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the moving party does not have the burden of proof at trial, it may discharge this threshold responsibility in two ways: either by producing evidence negating an essential element of the nonmoving party's claim, *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000), or showing "there is an absence of evidence to support the nonmoving party's case," *Celotex*, 477 U.S. at 325. *See* Fed. R. Civ. P. 56(c)(1)(B). Once that bar is cleared, "the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists," *Plumley v. S. Container, Inc.*, 303 F.3d 364, 368 (1st Cir. 2002), by "affirmatively point[ing] to specific facts" in the record revealing the presence of a meaningful dispute, *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation," *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56 submissions: defendants' statement of uncontested facts, Docket No. 39-1 ("DSUF"); plaintiffs' opposing statement of material facts, Docket No. 43-1 ("OSMF"); and defendants' reply statement of material facts, Docket No. 55-1 ("RSMF").[2]

### The Parties

GMD is a Puerto Rico corporation that provides year-round, around-the-clock cargo and passenger services to airline carriers in the Commonwealth of Puerto Rico. DSUF ¶¶ 1, 2. Cruz began working for GMD in 2007 as a ramp cargo agent and subsequently transferred to its workshop department, where he worked as a mechanic.[3] DSUF ¶¶ 3, 4. The workshop's twelve mechanics repaired and maintained ground service equipment and performed tasks commensurate with their level of expertise, experience, and knowledge. DSUF ¶¶ 10, 11. Easier tasks, like painting and changing the oil and

---

[2] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). The court may deem the movant's facts uncontested if they are not properly controverted in compliance with the rule, and litigants ignore it "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[3] GMD contends Cruz was transferred to the workshop because of his good mechanic skills, citing his deposition testimony. DSUF ¶ 4. The record does not support GMD's statement. Cruz correctly points out that during his deposition he did not know why he was transferred to the workshop, but speculated it was because the supervisor liked the way he worked. Cruz Dep. 64:9–25, 65:1. The dispute is immaterial.

filter on simple machinery, were assigned to "beginner" mechanics, while other mechanics could service more complex machinery, like "k-loaders." DSUF ¶ 3. Cruz was a mechanic qualified to work on k-loaders. *Id.* ¶ 30(e).

### *Cruz's First Request for Religious Accommodation*

Cruz took vacation leave in July 2012 and returned on Friday, August 17.[4] DSUF ¶¶ 12, 13. When he returned, Cruz noticed his usual weekly schedule had changed: rather than working his usual Sunday shift from 7:00 a.m. to 4:00 p.m., or 8:00 a.m. to 5:00 p.m., he was scheduled to work from noon until 9:00 p.m.[5] OSMF ¶ B. Cruz is a devout Christian and member of his church, *Iglesia Pentecostal Dios Restaurando el Alma y el Corazón.* Compl. ¶¶ 3.4–.5; Defs.' Mot. Sum J. 12. His weekly church service at 7:30 p.m. conflicted with his new schedule, and so he informed one of his two immediate supervisors, Jonathan Ruiz, who said he would look into it. DSUF ¶ 16; Defs.' Mot. Sum. J.12.

That same day, GMD's vice president of operations, Raúl Colón, called the workshop for an unrelated reason. *Id.* ¶ 17. Cruz answered the phone and informed him that he could not work on Sunday because of his church commitment. *Id.* Colón replied that he would authorize a schedule change if Cruz found someone to cover his shift. DSUF ¶ 17; OSMF 9 ¶ 17. Cruz was unable to do so. Cruz Dep. 117:22–118:9. Thereafter, Cruz and his two immediate supervisors met with Victor Betancourt to address the scheduling conflict. DSUF ¶ 7. Betancourt was responsible for creating the workshop's weekly schedules, and best knew the expertise, experience, and certifications of the workshop's mechanics. DSUF ¶¶ 9, 18–19. He considered such qualifications to ensure a qualified mechanic was scheduled to work anytime an airplane, particularly a

---

[4] Unless otherwise stated, all dates in this opinion occurred in 2012.
[5] The parties' dispute over the exact reason why the schedule changed before Cruz returned from vacation is immaterial. DSUF ¶ 8.

wide-body aircraft, was scheduled for service, or when the service required full ground support. *Id.*

During the meeting, Betancourt reminded Cruz that he signed an agreement in which he committed to work anytime.[6] OSMF ¶ D. Cruz responded that Christ was not in his life when he signed the agreement, that he was following the "Word" now that he had converted, and that GMD was making him choose between God and work. *Id.*; DSUF ¶ 20.[7] Cruz highlighted that since it was Friday, Betancourt had time to find a replacement for Sunday. OSMF ¶ G. Betancourt replied that if he let Cruz take that Sunday off, then he would have to let other employees take Sundays off to go drink beer to avoid discrimination.[8] OSMF ¶ F; Ruiz Decl. ¶¶ 6, 7. He also said GMD's human resources department must handle a religious accommodation request, refused to change the schedule, and instructed Cruz to turn in his identification badge if he refused to work that Sunday.[9] OSMF ¶¶ G, H; DSUF ¶ 21. Cruz gave Betancourt his identification badge, but he instructed Cruz to submit it to Karen Pizzarro, GMD's human resources supervisor, which Cruz did.[10] OSMF ¶ H; DSUF ¶ 23.

Cruz called Pizarro on Monday, August 20.[11] She requested his attendance at a meeting on Wednesday, during which Cruz was told he would receive an insubordination

---

[6] The parties' dispute over whether Betancourt once attempted to have Cruz make a letter in which he committed to work "24/7" is immaterial. OSMF ¶ O.

[7] The parties' dispute over the degree to which Cruz became upset during the meeting is immaterial. *Id.*

[8] GMD sought to strike Ruiz's account of Betancourt's statement. I determined the statement may be considered. Docket No. 82.

[9] The parties' dispute over whether Betancourt told Cruz the request had to be made in writing is immaterial because the parties ultimately agree that Betancourt acknowledged Cruz was requesting a religious accommodation for that Sunday. DSUF ¶ 21, 22,

[10] The parties' dispute over Cruz's emotional state during the meeting with Pizarro is immaterial. *Compare* Pizarro Dep. 14:11–12, 15:3–4, *with* Cruz Dep. 130:11–12.

[11] The parties dispute whether Cruz called Pizarro on his own initiative or per Pizarro's instructions. The record citations GMD provides do not support the proposition that Pizarro instructed Cruz to call on Monday. *See* Cruz Dep. 130:2–6; Pizarro Dep. 14:11–12, 15:3–4, 9–10. Cruz's evidence supports the proposition that Pizarro gave him no such instructions. Cruz Unsworn Decl. ¶¶ 5, 6.

memo and asked whether he was willing to return to work.[12] DSUF ¶ 24; OSMF ¶ J. Cruz agreed to return to work on Friday of that week and never received an insubordination memo. DSUF ¶ 25; OSMF ¶ J.

### *Cruz's Second Request for Religious Accommodation*

On September 4, Cruz submitted to Pizarro a written request for religious accommodation to have all Sundays off.[13] OSMF ¶ T. There is a genuine dispute as to whether they contemporaneously discussed alternative work schedules. *Compare* Pizarro Dep. 16:7–14, 19:1–4, *with* Cruz Dep. 259:2–22. Ten days later, Cruz submitted to Pizarro a letter confirming his church membership and detailing the church's services, which were held on Tuesdays at 7:30 p.m., Thursdays at 7:30 p.m., and Sundays at 10:30 a.m. and 7:30 p.m.[14] OSMF ¶ T; Defs.' Ex. 12. Cruz did not receive an immediate response from Pizarro or GMD's management about his religious accommodation request. OSMF ¶ T. On October 28, Betancourt told Cruz that he was attending church a sufficient amount of time since he could do so 75% of the time. DSUF ¶ 52. On October 31, Cruz filed a discrimination charge with the EEOC. DSUF ¶ 31; OSMF ¶ L. The next day, he received a letter from GMD, dated October 23, denying his request to have Sundays off. DSUF ¶ 33; OSMF ¶ U. Since the date of the letter and of its delivery did not coincide, Pizarro prepared a cover letter explaining that GMD did not deliver the letter when it was written because of an emergency. DSUF ¶ 33; OSMF ¶ U; Pls.' Ex. 14.

### *Evaluation of Cruz's Religious Accommodation Request*

---

[12] The parties dispute whether the meeting participants discussed Cruz's alleged behavior during the meeting on Friday, August 17. DSUF ¶ 25. This dispute is immaterial.

[13] Colón first became aware of Cruz's request to have all Sundays off as a religious accommodation when Cruz submitted the September 4 written request. OSMF ¶ P.

[14] The parties dispute whether Cruz submitted the letter on his own initiative or per Pizarro's instructions, and whether Colón asked Pizarro to ask Cruz to get a letter from his church. DSUF ¶ 29. Because there is no dispute that Cruz's request was considered a request for religious accommodation, this dispute is immaterial.

The letter denying Cruz's request to have all Sundays off explained that GMD operated around-the-clock throughout the year, that its customers expect the best service available, and that not having employees available on certain days would cause GMD an undue hardship. DSUF ¶ 32; Pls.' Ex. 13

GMD had an equal opportunity employment policy in its employee manual prohibiting discrimination and designating the human resources manager to handle religious accommodation requests. DSUF ¶ 42. However, Colón was the only person at GMD to evaluate Cruz's religious accommodation request, which he discussed with Betancourt. *Id.* ¶ 11. The parties dispute the considerations Colón evaluated.[15] *Id.* ¶ 30. According to his declaration, he considered the following:

First, Sunday is one of the busiest workdays for mechanics because more flights are scheduled on that day, as more passengers travel on weekends. *Id.* ¶ 30(b). Cruz responds that Sundays require low manpower hours, as indicated on the weekly schedules. OSMF ¶ 30.

Second, GMD would incur substantial additional payroll expenses if it gave Cruz all Sundays off. DSUF ¶ 30(o). The parties dispute whether any of the twelve mechanics could perform Cruz's duties. GMD alleges the mechanics have specialties, and that some could not work on electrohydraulic equipment due to lack of training or certifications. *Id.* ¶¶ 30(c)–(e). Cruz had vast experience, knowledge, and preparation in electrohydraulic equipment. *Id.* ¶ 30(e). Cruz said there were "not really" any specialties among mechanics, but admitted he seemed to do a better job than others on the k-loaders. Cruz

---

[15] Cruz's opposing statement of material facts does not conform to Local Rule 56 (c) because it does not specifically identify the paragraphs of GMD's statement of undisputed material facts it purports to controvert, while at the same time intertwining additional facts. D.P.R. Civ. R. 56 (c), (e); *see also Mariani-Colón*, 511 F.3d at 219 (parties may not "improperly shift the burden of organizing the evidence to the district court"). I have disregarded new facts in this statement, and have deemed uncontroverted the facts in DSUF paragraph 30.

Dep. 72:18–22. GMD admits that at least three mechanics had similar qualifications. DSUF ¶ 30(f).[16]

K-loader mechanics are trained to provide support when full ground support is needed or when servicing wide-body aircraft. *Id.* ¶ 30(g). When a k-loader fails because of the hydraulic system, it cannot be moved from under the plane. *Id.* ¶ 30(h). K-loaders are the most expensive, delicate equipment GMD owns, and constitute more than half the value of GMD's machinery. *Id.* ¶ 30(i). According to GMD, the k-loaders give it a competitive advantage over other servicers in the San Juan Airport and the k-loaders are an important factor airlines consider when choosing a servicer. *Id.* ¶ 30(j).

### GMD's Schedule Changes

Though GMD refused to accommodate Cruz's request to have Sundays off, it subsequently implemented schedule changes. GMD characterizes these schedule changes as informal attempts to accommodate Cruz's request to have Sundays off. Cruz characterizes these schedule changes as adverse actions.

### Mechanics Scheduled to Work on Sundays Rotated

GMD began rotating its qualified mechanics on Sundays. DSUF ¶¶ 34, 37. After doing so, Cruz remained scheduled to work some Sundays but did not work every Sunday. *Id.* Colón also instructed Betancourt to train other mechanics to work on hydraulic equipment and k-loaders to broaden the pool of qualified mechanics. DSUF ¶ 34. Cruz's timecard indicates he was off work before 7:30 p.m. six Sundays after returning from vacation. *Id.* ¶¶ 38, 39; Defs.' Ex. 10. Moreover, between Cruz's return from vacation and his last day, his schedule allowed him to attend weekday worship service, except on two occasions. *Id.* ¶ 47. When Cruz worked the Sunday shift that began at noon or 1:00 p.m., he attended his church's morning worship service but left early to arrive to work on time. OSMF ¶ M.

---

[16] Cruz alleges two other mechanics could have covered his Sunday shift. Cruz Unsworn Decl. ¶ 13.

***"Wait for Call" Schedule***

Because of recurring flight delays, particularly on Sundays, Betancourt implemented a "wait for call" schedule that had been used in other departments at GMD. DSUF ¶¶ 30(k), 56. GMD's "wait for call" schedule functioned as on-call duty: when an employee was on "wait for call," he would work on a particular day only if called. Pls.' Ex. 5, Medina Dep. 23:14–22. Cruz was the first to be placed on "wait for call" in the workshop and was on such duty more times than the other two mechanics who were also placed on call. DSUF ¶ 57. Cruz challenges the authenticity of the schedules, claiming he was placed on "wait for call" on November 4 instead of October 28. Pls.' Ex. 24. There is a genuine dispute as to when Cruz was placed on "wait for call."

***Reduced Hours***

Cruz was an hourly employee earning $8.35 per hour. DSUF ¶ 43. After he requested religious accommodation, rather than working his forty-hour shift, Cruz worked 40.08 hours from September 7 to September 12; 32.02 hours from September 21 to September 27; 35.36 hours from September 28 to October 4; 37.76 hours from October 12 to October 18; 31.90 hours from October 19 to October 25; 39.6 hours from October 26 to November 1; and 34.87 hours from November 2 to November 8. OSMF 26–27 ¶ 43; Defs.' Reply 3. The reduced hours resulted from Cruz not working or leaving early some Sundays.[17]

***Working Conditions***

Cruz began having problems with coworkers after he returned from vacation. OSMF ¶ O. His coworkers once commented that Cruz had the audacity to request the shift he wanted after returning from vacation. DSUF ¶ 48 ("Que pantalones, tras de que llega de vacaciones, tambien le van a dar el turno que le de le gana!"). Cruz also alleges a security guard not employed by GMD joked that not even a "witch doctor" could change

---

[17] Cruz's calculation of his reduced hours is similar, and his surreply does not dispute GMD's calculations. Pls.' Surreply 3 ¶ 7.

his Sunday shift. DSUF ¶ 49. Cruz does not know how the security guard found out about his request to change his Sunday shift. *Id.* Cruz further alleges a coworker refused to help him one day, claiming that he lacked the qualifications to help Cruz perform the required task. *Id.* ¶ 50. Moreover, after Cruz filed his EEOC charge, Colón tried to make Cruz feel guilty by saying, "do you remember that you told me you were never going to fail me and look what you come up with now, I am sorry to tell you that whoever messes with the company, messes with me and unfortunately I cannot be your friend anymore." *Id.* ¶ 51. Finally, Pizarro told Cruz that GMD employed Seventh Day Adventists and those employees worked on Saturdays because they needed to work. *Id.* ¶ 53.

### *Cruz's Resignation*

On December 28, Cruz gave two weeks' notice of his resignation from GMD. *Id.* ¶ 41. Cruz claims he resigned because his schedule from noon to 9:00 p.m. prevented him from attending his weekly church service. DSUF ¶ 46; OSMF ¶ O. On December 31, Colón demanded Cruz leave immediately during the middle of his shift, which he did. DSUF ¶ 41; OSMF ¶ N. Thereafter, Cruz did not immediately receive his final liquidation paycheck. OSMF ¶ N; Cruz Unsworn Decl. ¶ 13. In March 2013, an EEOC representative contacted GMD's attorney and requested that it pay Cruz the owed funds. OSMF ¶ N; Pls.' Ex. 17. Cruz called GMD several times asking for his paycheck, but was repeatedly told "it was not done yet." Cruz Unsworn Decl. ¶ 13. Cruz finally received his liquidation paycheck, dated March 2013, six months after his resignation. OSMF ¶ N; Pls.' Ex. 19; Cruz Unsworn Decl. ¶ 13.

## DISCUSSION

Cruz claims religious discrimination, hostile work environment, retaliation, and constructive discharge in violation of Title VII. GMD seeks summary judgment as to all these claims.

## I. Religious Discrimination

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1) (2012). The statute defines religion as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). "Thus, in general terms, Title VII requires employers . . . to accommodate, within reasonable limits, the bona fide religious beliefs and practices of employees." *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012) (quoting *EEOC v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de P.R.*, 279 F.3d 49, 55 (1st Cir. 2002)).

To establish a prima facie religious discrimination claim based on a failure to accommodate, "the plaintiff must show that '(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [employer's] attention, and (3) the religious practice was the basis for the adverse employment decision.'" *Unión Independiente*, 279 F.3d at 55 (quoting *EEOC v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir. 1996)). That showing made, the burden shifts to the employer to show (1) that it reasonably accommodated the religious practice, or (2) that any accommodation would result in undue hardship. *Unión Independiente*, 279 F.3d at 55.

GMD concedes Cruz is a devout Christian, that his work schedule conflicted with the general worship at his church, and that he brought the conflict to GMD's attention. Defs.' Mot. Summ. J. 12. These concessions establish the first two elements of Cruz's prima facie case, leaving for inquiry whether he suffered an adverse employment action.

## A.    Adverse Employment Action

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In most cases, such an action inflicts "direct economic harm." *Id.* Whether an employment action is materially "adverse"—and therefore actionable under Title VII—is gauged by an objective standard. *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996). "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002).

Cruz argues he suffered three adverse employment actions: (1) his hours were reduced; (2) Betancourt instructed him to turn in his identification badge if he refused to work on Sunday, August 19; and (3) GMD placed him on on-call duty some Sundays.[18] Pls.' Opp'n Summ. J. 9–10.

### 1.    Reduced Hours

The Supreme Court has held that "[t]he provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). Generally speaking, "[t]he direct effect of [unpaid leave] is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status." *Id.* (quoting *Nashville Gas Co. v. Satty*, 434 U.S. 136, 145 (1977)). Accordingly, the Sixth Circuit held that an employee suffered no adverse employment action where he sought Saturdays off

---

[18] Cruz does not allege for the purposes of this claim that he was terminated on December 31, and that such a termination constitutes an adverse action. Pls.' Opp'n Summ. J. 9–10. Thus, the adverse actions discussed here are those for which Cruz develops an argument in his opposition. *See e.g., Tejada-Batista v. Morales*, 424 F.3d 97, 103 (1st Cir. 2005) (stressing that "[a]n argument not seriously developed in the opening brief" is lost).

to observe his Sabbath and the employer "forced" him to take those days off without pay. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).

Cruz alleges his hours were reduced because he worked less than his usual forty hours some weeks after he requested all Sundays off, which is undisputed. Pls.' Opp'n Summ. J. 9–10; Defs.' Reply 3. Though Cruz does not dispute his hours were reduced because he did not attend work, was late, or left early some Sundays, he nonetheless maintains that the mere fact that he worked fewer hours constitutes an adverse employment action. Defs.' Reply 3; Pls.' Surreply 3 ¶ 7. Because GMD claims it attempted to give Cruz some Sundays off after his request to have all Sundays off, he cannot reasonably argue that this attempted accommodation transforms into an adverse employment action. *See Philbrook*, 479 U.S. at 70. GMD chose to provide "unpaid leave" to allow Cruz "to observe fully religious [his] holy days and required [him] only to give up compensation for the [the days] he did not in fact work," and thus Cruz suffered no adverse employment action. *See id.*

### 2.    *Instruction to Submit Identification Badge*

Cruz next argues Betancourt's "request that he turn in his [identification badge] is by itself an adverse employment action." Pls.' Opp'n Summ. J. 10; Pls.' Surreply 2. Cruz fails to develop this argument, cite authority supporting it, or otherwise explain how this action "constitutes a significant change in employment status . . . or a decision causing a significant change in benefits." *See Ellerth*, 524 U.S. at 761; *see also Tejada-Batista*, 424 F.3d at 103 ("An argument not seriously developed in the opening brief" is lost); *Grigous v. Gonzáles*, 460 F.3d 156, 163 (1st Cir. 2006); *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81–82 (1st Cir. 2001). Parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority, as judges are not mind readers. *See e.g., United States v. Bongiorno*, 106 F.3d 1027, 1034 (1st Cir. 1997). Thus, Cruz has not

carried his burden in showing Betancourt's request that he submit his identification badge is an adverse employment action.

### 3.       *"Wait for Call" Schedule*

Courts have held that placing an employee on call does not constitute an adverse employment action. *Vives v. Children's Hosp., Inc.*, No. CIV.A. 11-2080, 2013 WL 5607215, at *5 (E.D. La. Oct. 14, 2013); *Vinson v. Dep't of Corr. Fla.*, 672 F. Supp. 2d 1247, 1261 (N.D. Fla. 2009). In *Vives*, the court held that a doctor suffered no adverse employment action as a matter of law when she was scheduled to be on call during her days off, but was not actually called to work. *Vives*, 2013 WL 5607215, at *5. The *Vives* court reasoned the on-call schedule did not affect the employee's job duties, compensation, or benefits because its only effect was to keep the employee on her "tip toes" in case she was called to work. *Id.* at 4–5.

Cruz argues the "wait for call" schedule was a punishment, and that it kept an employee from making commitments for the day he is scheduled on call. Pls.' Ex. 5, Medina Dep. 6:4–5. Cruz cites no authority holding that placing an employee on call is an adverse employment action. As in *Vives*, where the only effect of being placed on call was to keep the employee on her "tip toes" in case she was called to work, GMD's "wait for call" schedule as implemented here is not an adverse employment action. *See Vives*, 2013 WL 5607215, at *5. Because Cruz's failure to show an adverse action prevents him from establishing a prima facie case, summary judgment in GMD's favor is granted on this claim.

### B.       **Reasonable Accommodation**

Even if Cruz had met his prima facie case, summary judgment as to this claim is still appropriate because GMD accommodated his initial religious accommodation request. DSUF ¶ 17; OSMF 9 ¶ 17; Cruz Dep. 117:22–118:9. The Supreme Court has held that once an employer has offered one reasonable accommodation, "the statutory

inquiry is at an end." *Philbrook*, 479 U.S. at 68. The employer is not required to "choose any particular reasonable accommodation," as such a requirement "would give the employee every incentive to hold out for the most beneficial accommodation, despite the fact that an employer offers a reasonable resolution to the conflict." *Id.* at 68–69. Yet, "[c]ases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior." *Sánchez-Rodríguez*, 673 F.3d at 12. And when determining whether an employer provided a reasonable accommodation, courts will consider the "totality of the circumstances" and determine whether the "combination" of accommodations the employer attempted was reasonable. *Id.*

Several circuit courts have held that an employer has reasonably accommodated an employee's request for religious accommodation when it allows the employee to arrange shift swaps with other employees. *See e.g., Sturgill v. United Parcel Serv., Inc*, 512 F.3d 1024, 1032 (8th Cir. 2008) (employer reasonably accommodated employee's request for religious accommodation when it allowed the employee to swap shifts with another employee); *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 592–93 (11th Cir. 1994) (same); 29 C.F.R. § 1605.2(d)(1)(i) (2015) (shift swaps one of various reasonable accommodations); *see also Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 144–45 (5th Cir. 1982) (reasonable accommodation where employer allowed a rotation schedule so that some employees did not have to work on their holy days).

But several circuit courts have held that such an accommodation is insufficient when the employer is confronted with two religious objections and the shift swap only addresses one, or when the employer has interfered with the employee's attempts to secure a shift swap. *See Baker v. The Home Depot*, 445 F.3d 541, 547 (2d Cir. 2006) (employer did not reasonably accommodate employee where employee's religion required total abstention from work on Sundays and employer only allowed employee to swap his night shift to the morning shift); *Smith v. Pyro Mining Co.*, 872 F.2d 1081, 1088 (6th Cir. 1987) (employer reasonably accommodated employee by allowing shift swaps

so long as employee had no religious constraints against arranging the shift swap); *McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 610 (6th Cir. 1992) (summary judgment inappropriate where employer allowed employee to swap shifts but possibly compromised the willingness of other employees to do so).

This court has held that an employer satisfies its duty to reasonably accommodate an employee's request to be exempt from working on his Sabbath when it allows him or her to arrange voluntary shift swaps. *Sánchez-Rodríguez v. AT&T Wireless*, 718 F. Supp. 2d 31, 42–43 (D.P.R. 2010), *aff'd on other grounds*, 673 F.3d 1, 12–13 (whether allowing employee to swap shifts by itself satisfied duty to accommodate not decided where the combination of a series of attempts did so).

On August 17, Cruz became aware of the conflict between his weekly church service and his new schedule. He informed Colón of the conflict, and Colón said he authorized a schedule change if Cruz found a replacement to work for him on Sunday. Cruz was unable to do so. Because GMD allowed Cruz to swap his shift with another employee, it offered a reasonable accommodation and thus satisfied its duty to present at least one reasonable accommodation. *Sánchez-Rodríguez*, 718 F. Supp. 2d at 42–43; *see also Philbrook*, 479 U.S. at 68.

In addition, because Cruz does not allege his religious beliefs prohibited him from seeking the assistance of others to cover his shift, or that GMD compromised his ability to secure a shift swap, the circuit court decisions finding shift swaps insufficient under certain circumstances are inapplicable here. *See Baker*, 445 F.3d at 547 (employer's purported accommodation only addressed one of two conflicts employee presented); *Smith*, 872 F.2d at 1088 (employee's religion prohibited seeking assistance from coworkers to cover shift); *McGuire*, 956 F.2d at 610 (insufficient accommodation where employer possibly compromised employee's ability to arrange shift swap). Thus, even if Cruz had shown a prima facie religious discrimination case for his August 17 religious accommodation request, GMD satisfied its duty to accommodate.

Cruz also argues GMD "did nothing" about his September 4 written request to have all Sundays off. Pls.' Opp'n Summ. J. 11. GMD admits it denied Cruz's request to have all Sundays off, but claims it implemented a series of schedule changes to accommodate Cruz: it rotated the mechanics scheduled to work on Sundays, gave Cruz some Sundays off, and began training other mechanics to perform Cruz's shifts. It is undisputed that Cruz was not required to work every Sunday after his written request for religions accommodation. As in *Sánchez-Rodríguez*, where the First Circuit held the employer reasonably accommodated the employee when it denied the employee's requested accommodation but attempted a combination of alternative accommodations, GMD reasonably accommodated Cruz by implementing schedule changes that gave him some Sundays off. *See Sánchez-Rodríguez*, 673 F.3d at 12–13.

Additionally, because GMD had previously allowed Cruz to swap shifts, and did not place any restrictions on using this accommodation in the future, Cruz could have sought this accommodation again.[19] *See Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1323–24 (11th Cir. 2007) (employer satisfied duty of religious accommodation by allowing employee to arrange shift swaps and placing no restrictions or impediments on the employee's ability to seek a replacement); *see also Brener*, 671 F.2d at 145–46 ("Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer. A reasonable accommodation need not be on the employee's terms only."). Thus, the combination of GMD's attempts to reasonably accommodate Cruz satisfied its duty to do so.

---

[19] Cruz's deposition testimony indicates he informed Colón that he could not work on Sunday, August 17, but also that "he could not attend that schedule [noon to 9:00 p.m.] . . . . because he had a commitment in the church." Cruz Dep. 117:6–23.

### C.        Undue Hardship

Because GMD demonstrated it reasonably accommodated Cruz, it need not—but nonetheless did—demonstrate that giving Cruz all Sundays off would cause its business undue hardship. *Philbrook,* 479 U.S. at 68.

"An accommodation constitutes an 'undue hardship' if it would impose more than a *de minimis* cost on the employer." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 134–35 (1st Cir. 2004) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). Hardship includes "both . . . economic costs, such as lost business or having to hire additional employees to accommodate a Sabbath observer, and . . . non-economic costs, such as compromising the integrity of a seniority system." *Cloutier*, 390 F.3d at 134. Further, in *Hardison*, the Supreme Court reasoned that "[i]t would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees . . . in order to accommodate or prefer the religious needs of others, and . . . conclude[d] that Title VII does not require an employer to go that far." 432 U.S. at 81.

This court has joined others in recognizing that compromising a scheduling system constitutes an undue hardship. *Sánchez-Rodríguez*, 728 F. Supp. 2d at 43–44; *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) ("[t]he mere possibility of an adverse impact on co-workers as a result of 'skipping over' [an employee in a scheduling system] is sufficient to constitute an undue hardship"); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1022–24 (10th Cir. 1994) (employer not required to assign another employee to perform plaintiff's duties); *Chrysler Corp. v. Mann*, 561 F.2d 1282 (8th Cir. 1977) ("[e]mployer should [not] have to adjust its entire work schedule to accommodate individual religious preferences and practices").

GMD operates around-the-clock throughout the year, and requires its employees to be available to work anytime during its operations. Cruz could not find a replacement for his Sunday shift, and argues GMD could have scheduled other employees to work his

shift. The parties extensively dispute the exact qualifications, experience, and expertise Cruz had relative to other GMD employees. But that type of inquiry places a higher burden on GMD than Title VII requires. The parties agree the mechanics at the workshop have different levels of experience, and that Betancourt made the schedule by considering the qualifications of each employee. GMD would suffer undue hardship if it were required to change its scheduling system because of the difficulty of finding a replacement employee of comparable skill, experience, and qualifications; because other employees would be required to work more often during the weekend; and because GMD would incur substantial payroll expenses to give Cruz all Sundays off. *See Sánchez-Rodríguez*, 728 F. Supp. 2d at 43–44; *Weber*, 199 F.3d at 274. That GMD would suffer undue hardship also dictates summary judgment on this claim.

## II.     Hostile Work Environment

Cruz next argues he endured a hostile work environment at GMD. To establish a hostile work environment claim based on religion under Title VII, the plaintiff must show "that: (1) she is a member of a protected class; (2) she was subject to uninvited harassment; (3) the offending conduct was *because of her religion;* (4) the harassment was severe and pervasive; (5) the offending conduct was both objectively and subjectively offensive and (where employer liability is sought); (6) there was a basis for such liability." *Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 189 (1st Cir. 2003). Cruz alleges he endured harassment, but fails to argue the other elements of a religious harassment claim. Pls.' Opp'n Summ. J. 16–17. GMD argues that even if the incidents Cruz alleges occurred, they are insufficiently severe or pervasive to establish a claim under Title VII.

### A.     Severe and Pervasive Harassment

The Supreme Court has held that a Title VII claim of harassment must be sufficiently "severe or pervasive" to affect a "term or condition of employment." *Meritor*

*Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Courts look at the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [ ] jokes, and occasional teasing." *Id.* at 788.

Cruz claims he was harassed because (1) coworkers in the workshop commented that he had the audacity to request the shift he wanted after returning from vacation; (2) a security guard not employed by GMD joked that not even a "witch doctor" could change his Sunday shift; (3) a coworker once refused to help him, claiming he did not have the qualifications; (4) Betancourt told Cruz that he could not give him Sundays off because doing so would require him to give other employees Sundays off to go drink beer to avoid discriminating against them; (5) Betancourt said Cruz could attend 75% of the worship times at his church and that was sufficient; and (6) Pizarro commented that Seventh Day Adventists working for GMD worked on Saturdays because they needed to work.

These comments were insufficiently severe or pervasive, either in isolation or cumulatively, to alter Cruz's terms or conditions of employment. *See Meritor*, 477 U.S. at 67. The comments were not physical threats, were isolated incidents by different individuals, and consist of offhand comments, a joke, and teasing. Cruz admits, for

example, that the statement the security guard made was a joke.[20] DSUF ¶ 49; *see* *Faragher*, 524 U.S. at 787–88. Moreover, the statement by Cruz's coworkers was mere teasing because they seemed displeased that Cruz was asking them to cover his Sunday shift after returning from vacation. Pizarro's and Betancourt's statements were offhand remarks that were insufficiently severe to change a "term or condition of [Cruz's] employment." *See id.* Thus, Cruz cannot establish a prima facie claim of religious harassment because the incidents he complains of were insufficiently severe or pervasive, and because he fails to argue all the elements necessary for this claim.

## III.    Retaliation

Title VII makes it unlawful for "an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made unlawful under [Title VII] or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) (2012). The Supreme Court has explained that this "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Plaintiff establishes a prima facie retaliation case by showing that (1) he undertook protected conduct; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action. *Gu v. Bos. Police Dep't*, 312 F.3d 254, 262 (1st Cir. 2004). That showing made, the burden shifts to the employer to articulate a legitimate, nonretaliatory explanation for its actions. *Douglas v. J.C. Penney Co.*, 474 F.3d 10, 14 (1st Cir. 2007). If the employer carries this burden of production, then the burden returns to plaintiff to show the defendant's reason is a pretext for unlawful retaliation. *Id.*

---

[20] Cruz does not allege the "witch doctor" comment was in some way an innuendo or reference to his religious beliefs.

GMD concedes Cruz engaged in protected conduct when he filed a discrimination charge with the EEOC on October 31. *See e.g., Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007) (plaintiff engaged in protected conduct when he contacted the EEOC). However, GMD argues Cruz did not suffer an adverse action, and that he cannot establish a causal link between his protected conduct and the adverse actions he alleges.

## A.    Materially Adverse Action

A materially adverse action under the "antiretaliation provision, unlike the substantive provision of [Title VII], is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N.*, 548 U.S. at 64; *see also Billings v. Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) ("[C]onduct need not relate to the terms or conditions of employment to give rise to a retaliation claim."). Rather, a plaintiff may satisfy this requirement by showing that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 64. "This is an objective test and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 71). Under this inquiry, "context matters." *Burlington N.*, 548 U.S. at 69. Examples of adverse employment actions in the retaliation context "include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Cruz argues he suffered various adverse actions. First, GMD warned him in a "nonspecific manner" about being tardy and absent. His argument lacks merit. Warnings do not rise to the level of materially adverse actions if they result in no tangible consequences, and are "the kind of de minimis employment hand-slap which falls beneath the radar screen of Title VII." *Wyse v. Summers*, 100 F. Supp. 2d 69, 77 (D. Mass. 2000); *Castro-Medina v. Procter & Gamble Commercial Co.*, 565 F. Supp. 2d 343, 383 n.21 (D.P.R. 2008).

Second, GMD denied his request for religious accommodation. The First Circuit has held that "an employer could offer an 'accommodation' that is so unreasonable or un-workable, or such an insult to an employee's religious beliefs, that a reasonable person would be dissuaded from pursuing a charge of discrimination." *Sánchez-Rodríguez*, 673 F.3d at 15 (employee did not establish retaliatory adverse action where employer denied employee's requested accommodation but attempted a series of alternative accommodations). In contrast, an employee's mere dissatisfaction with the extent of the accommodation provided is insufficient. *Carmon-Rivera v. P.R.*, 464 F.3d 14, 20 (1st Cir. 2006). As discussed above, though GMD denied Cruz's request to have Sundays off, it allowed him to swap shifts with other employees and later attempted a series of accommodations to give Cruz some Sundays off. *See Carmon-Rivera*, 464 F.3d at 20 (employer "made some attempt to accommodate [employee's] needs even though the results were not to a level she deemed satisfactory" and "there is little indication that the actions of the defendants would have the chilling effect of deterring others from filing their own requests for a needed accommodation"). As in *Sánchez-Rodríguez*, this is not a case where a reasonable person would be dissuaded from filing a discrimination charge because GMD allowed Cruz to swap shifts and made other attempts to accommodate him. *See Sánchez-Rodríguez*, 673 F.3d at 15.

Third, the vice president of operations and the person responsible for evaluating Cruz's accommodation request made a comment about not being his friend anymore after

he filed the EEOC charge. DSUF ¶ 51; Defs.' Mot. Summ. J. 22. Though the comment may be relevant to establishing a causal connection, it is not a materially adverse action because there were no tangible consequences within or outside the workplace that would dissuade a reasonable person from engaging in protected conduct. *See Summers*, 100 F. Supp. 2d at 77 (supervisor's comment that employee seek counseling insufficient to establish adverse action).

Fourth, that Cruz was once told to leave two hours before his shift ended is not a materially adverse action because it did not amount to a significant change in benefits and would not dissuade a reasonable worker from engaging in protected conduct. *See Cham v. Station Operators*, 685 F.3d 87, 94 (1st Cir. 2012) (no adverse employment action where employer scheduled at-will employee to work 24 hours on one particular week rather than the employee's usual 40 hours).

Fifth, Cruz was placed on "wait for call" several times, but cites no authority explaining why this is a materially adverse action in the retaliation context. *See Vinson v. Dep't of Corr. Fla.*, 672 F. Supp. 2d 1247, 1261 (N.D. Fla. 2009). The *Vinson* court held an employee suffered no adverse employment action where the employer refused to remove the employee from on-call duty and the employee was not actually called to work while on call. *Id.* Cruz was similarly placed on call, but does not allege he was ever called to work. Even if he had, Cruz does not argue the "wait for call" schedule had any effect other than possibly compromising an employee's other commitments for that day. The "wait for call" schedule would thus not dissuade a reasonable employee from engaging in protected conduct. Moreover, GMD claims the "wait for call" schedule was implemented because some flights were being delayed. DSUF ¶ 58. Cruz conclusorily denies GMD's proffered reason, but does not present evidence showing this legitimate business reason is a pretext for retaliation. *See Douglas*, 474 F.3d at 14.

Sixth, Cruz alleges he was terminated from GMD's employment when Colón demanded he leave on December 31, three days after Cruz gave two weeks' notice of his

resignation. OSMF ¶ N. GMD claims it did not terminate Cruz because he had already resigned. The First Circuit has held that once an employee has tendered his resignation claiming constructive discharge and the employer later ends the employment relationship, the employee cannot transform an otherwise voluntary resignation into a termination. *See Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 53 (1st Cir. 2008) (employee could not claim employer "terminated" him when he voluntarily resigned after subjectively, but erroneously, believing he was being constructively discharged). As discussed below, the conditions Cruz endured did not lead to a constructive discharge. Because Cruz voluntarily resigned, he suffered no adverse action.

Finally, GMD did not deliver Cruz's final liquidation paycheck until six months after his resignation.[21] Pls.' Opp'n Summ. J. 18. The Supreme Court has held that an employee may bring suit "against his former employer for postemployment actions allegedly taken in retaliation" for filing an EEOC charge. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345–46 (1997). Withholding a paycheck is an adverse employment action under Title VII's substantive discrimination provision because it inflicts direct economic harm on the employee. *Jin v. Metro Life Ins. Co.*, 310 F.3d 84, 99–100 (2d Cir. 2002) (adverse employment action where employer withheld employee's paycheck); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223–24 (2d Cir. 2001) (employee established adverse employment action for ADA retaliation claim by showing she was suspended without pay for one week, even though she was later reimbursed). *But see Siler v. Hancock Cnty. Bd. of Educ.*, 510 F. Supp. 2d 1362, 1381 (M.D. Ga. 2007) (four-day "delay had no appreciable effect on [employee], and, more importantly, the delay would not have dissuaded a reasonable worker from making or supporting a charge of discrimination"). In *Burlington Northern*, the Court held a reasonable person in the employee's position could be deterred from engaging in protected conduct where the

---

[21] GMD moved to exclude Cruz's unsworn declaration. I determined it may be considered. Docket No. 82.

employee was suspended without pay for 37 days. 548 U.S. at 72–73. Though the employee was awarded backpay, the Court reasoned that "many reasonable employees would find a month without a paycheck to be a serious hardship." *Id.*

Cruz alleges GMD did not deliver his final paycheck until six months after he resigned. OSMF ¶ N; Cruz Unsworn Decl. ¶ 13. Cruz called GMD several times attempting to get his paycheck, but repeatedly was told it was not ready. Cruz Unsworn Decl. ¶ 13. GMD admits that in March 2013 an EEOC representative asked GMD's attorney to send Cruz's check. Cruz received a check dated March 2013, but declares under penalty of perjury that he did not receive it at that time. Cruz Unsworn Decl. ¶ 13; Pls.' Ex. 19.

Because Cruz was deprived of his final liquidation paycheck for six months, he suffered "direct economic harm." *See Jin*, 310 F.3d at 99–100. And the six-month delay here is more serious than the four-day delay in *Siler*. 510 F. Supp. 2d at 1381. Because "many reasonable employees would find a month without a paycheck to be a serious hardship," the six-month delay here resulted in the type of hardship that might deter a reasonable employee from engaging in protected conduct. *See Burlington N.*, 548 U.S. at 72; *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 ("[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions"). Cruz therefore established that he suffered a materially adverse action.

### B.    Causal Link

Cruz argues there is a causal link between the adverse actions he alleges and his filing of the EEOC charge. To determine whether causation exists, courts consider the temporal proximity between the protected activity and the adverse action, the sequence of events, any departures from normal procedure, and contemporaneous statements by the employer's decision makers. *Del Pilar Salgado v. Abbot Labs.*, 520 F. Supp. 2d 279, 292

(D.P.R. 2007). A plaintiff may establish a prima facie case of causation by showing "very close" temporal proximity. *Calero-Cerezo*, 355 F.3d at 25–26 (temporal proximity of "roughly one month" is "very close"); *Sánchez-Rodríguez*, 673 F.3d at 15 (temporal proximity of three months sufficient). The prima facie burden is "not an onerous one." *Id.* at 26.

Cruz argues GMD retaliated against him "immediately" after he filed his EEOC complaint on October 31. Pl's. Opp'n Summ. J. 18. He alleges the adverse actions occurred within 30 days after filing his EEOC charge. *Id.* As discussed above, the alleged termination, the reduced working hours, the "wait for call" schedule, Colón's statement, and GMD's denial of Cruz's request for accommodation did not constitute materially adverse actions. Thus, the relevant time period here was not 30 days.

With respect to GMD's withholding of Cruz's final paycheck, the temporal proximity was approximately two months because he filed his EEOC charge on October 31 and his last day at GMD was December 31. As in *Sánchez-Rodríguez*, where the temporal proximity of approximately three months was " very close" and sufficient to establish plaintiff's prima facie case of causation, the two-month temporal proximity here is sufficient. 673 F.3d at 15. Moreover, after he filed the EEOC charge, GMD's vice president of operations and the person responsible for evaluating his accommodation request told Cruz that whoever messes with his company messes with him, and therefore Cruz was no longer his friend. *See Del Pilar Salgado*, 520 F. Supp. 2d at 292; *see also Young-Losee v. Graphic Packaging Intern.*, Inc., 631 F.3d 909, 912 (8th Cir. 2011) (plaintiff presented evidence of causal relationship where her supervisor "wadded up her complaint, called it 'total bullshit,' threw it in the garbage can, told her to leave, and said he never wanted to see her again"). Because a reasonable jury could infer causation from the "very close" temporal proximity and Colón's statement, Cruz has established a prima facie case of retaliation.

### C.        Legitimate, Nonretaliatory Reason

The burden now shifts to GMD to provide a legitimate, nonretaliatory reason for the withheld paycheck. *See Douglas*, 474 F.3d at 14. GMD provides no such response in its reply, and its reply statement of facts conclusorily denies the allegation and vaguely states that the "address provided by the EEOC investigator is different from the one in Mr. Cruz's personnel file." DRSF 9 ¶ 28. Even if this statement is true, GMD does not allege that it previously sent Cruz a check to a different address or otherwise explain the reason for the delay. Its failure to do so prevents it from rebutting Cruz's prima facie case. Thus, summary judgment is denied as to Cruz's retaliation claim arising from the withheld paycheck.

## IV.     Constructive Discharge

Cruz also argues GMD constructively discharged him by maintaining a harassing, hostile work environment that caused him to resign on December 28. Pls.' Opp'n. 18–19. Constructive discharge "usually refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." *Lee-Crespo v. Schering-Plough del Caribe Inc.*, 354 F.3d 34, 45 (1st Cir. 2003). To establish constructive discharge, a plaintiff must "show that [his] working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." *Id.* (quoting *Marrero*, 304 F.3d at 28). "The standard is an objective one; an employee's subjective perceptions do not govern." *Id.* "A plaintiff seeking to withstand summary judgment must point to evidence in the record showing that [intolerable working conditions] existed." *Gerald v. Univ. of P.R.*, 707 F.3d 7, 25 (1st Cir. 2013).

Because I determined that Cruz's hostile work environment claim lacks merit, his constructive discharge claim also fails. *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47–48 (1st Cir. 1998); *see also Schwapp v. Town of Avon*, 118 F.3d 106,

112 (2d Cir. 1997) (constructive discharge claim "rises or falls on the determination of the hostile work environment facts"). Moreover, because GMD withheld Cruz's paycheck only after he left GMD, he cannot rely on this incident to establish his constructive discharge claim. Summary judgment is thus granted in GMD's favor on the constructive discharge claim.

## V.        Supplemental Claims

Cruz also alleges state law claims for withholding of payment under Law 17, unjust dismissal under Law 80, religious discrimination under Law 100, retaliation under Law 115, and tort liability under Civil Code Article 1802.

### A. Law 100

Law 100 prohibits discrimination on account of several protected characteristics, including "religious ideology." P.R. LAWS ANN. tit. 29, § 146 (2009 & Supp. 2013). GMD contends Law 100 and Title VII discrimination claims based on religion are conterminous, which Cruz does not dispute. Defs.' Mot. Summ. J. 24–25. Pls.' Opp'n Summ. J. 20. Because Cruz's Title VII religious discrimination claim has been dismissed with prejudice, his Law 100 claim against all defendants is also dismissed with prejudice.

### B. Law 115

Law 115 provides a cause of action when an employer retaliates against an employee for engaging in protected conduct. P.R. LAWS ANN. tit. 29, § 194(a) (2009). GMD again contends Law 115 is coterminous with Title VII's antiretaliation provision, which Cruz does not dispute. Defs.' Mot. Summ. J. 24–25. Pls.' Opp'n Summ. J. 20. Because I determined Cruz established a prima facie retaliation case, summary judgment is denied on the withheld check retaliation claim.

### C. Law 80

Law 80 requires "employers to compensate employees who are discharged without just cause." *Baltodano v. Merck, Sharp & Dohme (I.A.) Corp.*, 637 F.3d 38, 41–

42 (1st Cir. 2011). It requires employees to first show they were "discharged." *Id.* at 42. Because Cruz voluntarily resigned and was not discharged, his Law 80 claim is dismissed with prejudice.

### D. Law 17

Law 17 generally requires employers to timely pay wages owed to employees. *See* P.R. LAWS ANN. tit. 29, § 171 *et seq.* (2009). Cruz alleges GMD violated Law 17 when it withheld his final liquidation paycheck. Compl. ¶¶ 11.1–.3; Pls.' Opp'n Summ. J. 20. GMD responds that this "this state law claim is completely unrelated to the rest of the causes of action." Defs.' Mot. Summ. J. 25. But because this state law claim and Cruz's retaliation case arise from the same nucleus of operative facts, namely, the withholding of his final liquidation paycheck, I will exercise supplemental jurisdiction over it. 28 U.S.C. § 1367(a).

### E. Article 1802

Cruz alleges tort liability under Article 1802. P.R. Civ. Code art. 1802, P.R. LAWS ANN. tit. 31, § 5141 (1990 & Supp. 2013). This claim is not cognizable because it arises from the same facts as other claims I already dismissed. Article 1802 is only supplementary to special legislation: when a specific labor law covers the conduct for which a plaintiff seeks damages, he is barred from using that same conduct as the basis for a claim under Article 1802. *Rivera-Melendez v. Pfizer Pharm., Inc.*, 747 F. Supp. 2d 336, 339 (D.P.R. 2010); *Medina v. Adecco*, 561 F. Supp. 2d 162, 175–76 (D.P.R. 2008). For his Article 1802 claim, Cruz alleges "[d]efendants' actions worsened [his] employment conditions to the extent that illegally forced him to terminate his employment with GMD." Compl. ¶ 10.3. This alleged tortious conduct is the same conduct alleged in Cruz's Title VII hostile work environment and constructive discharge claims, Law 80 claim, and Law 100 claim. Because these claims were dismissed, and Cruz fails to provide any independent basis for his Article 1802 claim, it is also dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the motion is **GRANTED IN PART AND DENIED IN PART**. Summary Judgment is **DENIED** as to Cruz's Title VII retaliation, Law 115, and Law 17 claims. Cruz's Title VII religious discrimination, hostile work environment, and constructive discharge claims; Law 80 claim; Law 100 claim; and Article 1802 claim are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of September 2015.

S/ Bruce J. McGiverin
BRUCE J. McGIVERIN
United States Magistrate Judge